1

2

3

4

5

6

7

8
                    UNITED STATES DISTRICT COURT
9
                   EASTERN DISTRICT OF CALIFORNIA
10
                        ----oo0oo----
11
NICHOLAS SIUDA, by and through
12 his Guardian Ad Litem, TERESA
SIUDA, DOMINICK TRANFAGLIA, by
13 and through his Guardian Ad
Litem, CHRISTINA TRANFAGLIA,
14                                   NO. CIV. S-03-2439 FCD/KJM
            Plaintiffs,
15
      v.                            MEMORANDUM AND ORDER
16
UNITED STATES OF AMERICA,
17
            Defendant.
18
                        ----oo0oo----
19

20      This matter is before the court on defendant United States

21 of America's ("defendant")[1] motion for summary judgment, or in

22 the alternative, partial summary judgment in this Federal Tort

23

24

25 _____

26      [1]   The United States of America is the sole remaining
defendant; the other named defendant in the complaint, Child
27 Development Center Number Three was dismissed pursuant to the
court's order of January 7, 2005 (granting the government's
28 unopposed motion to dismiss said defendant and certain causes of
action against the government)

                              1

Claims Act[2] case involving allegations of child abuse at a United States Air Force preschool.  Plaintiffs Nicholas Siuda ("Nicholas") and Dominick Tranfaglia ("Dominick") (collectively, "plaintiffs"), by and through their mothers as guardians ad litem, oppose the motion.

The court heard oral argument on December 16, 2005.  At the hearing, the court granted plaintiffs leave to file a motion to re-open discovery, under Federal Rule of Civil Procedure 16(b),[3] to depose a former employee of the preschool; plaintiffs filed said motion on December 21, 2005; defendant filed its opposition on December 23, 2005.

By this order, the court now renders its decision on both motions.  Because the court denies plaintiffs' motion to re-open discovery, it reaches the merits of defendant's motion for summary judgment.  For the reasons set forth below, the court DENIES defendant's motion.

///

///

///

///

///

---

[2]   Plaintiff brings the instant suit against the government pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680, which is the source of the court's jurisdiction over the matter.

[3]   Unless otherwise noted, all further references to a "Rule" are to the Federal Rules of Civil Procedure.

2

# BACKGROUND[4]

According to Nicholas' mother, Teresa Siuda ("Mrs. Suida"), on September 15, 2000 when she picked Nicholas, age four, up from the Child Development Center Number Three at Travis Air Force Base ("CDC3"), Nicholas told her he had a new friend named Rocky (also age four). (Ex. D [Mrs. Suida's Depo.] to Def.'s Appendix of Evid. ["DAE"], filed Sept. 27, 2005, at 62:6-63:5.) Nicholas told Mrs. Suida that he was mad at Rocky because Rocky asked him to play a game called "pee pee in the butt" while they were in the playground train. Nicholas said he told Rocky he did not want to play; Rocky said that if Nicholas did not play he was going to punch Nicholas in the face; Nicholas said if you punch me, I'm going to punch you right back. Nicholas told his mother that nothing else happened. (Id. at 32:17-21; 64:13-65:6.)

On September 18, 2000 (the next business day), Nicholas' parents told the Director of CDC3, Teresa Costa ("Ms. Costa"), about the conversation between Rocky and Nicholas.[5] According to Mrs. Suida, Ms. Costa promised that Rocky would not be near

---

[4]     The following factual background includes facts objected to by defendant on the basis of "inadmissible hearsay." As set forth below, the court overrules defendant's global objection to all of plaintiffs' evidence, except plaintiffs' deposition testimony. Accordingly, the facts as described herein relate both to the facts as developed at the time of the alleged incidents of abuse and as subsequently testified to by plaintiffs in their depositions in this case. Unless otherwise noted, the facts recited herein are undisputed. (See Def.'s Mem. of P. & A., Stmt. of Undisputed Facts ["SUF"], filed Sept. 27, 2005, at 2-11; Pls' Opp'n, filed Nov. 21, 2005, at 7-11.) Where the facts are in dispute, the court recounts plaintiffs' version of the facts.

[5]     Ms. Costa recalls that *Mr.* Suida came up to her on the playground and told her about the conversation between Rocky and Nicholas. (SUF at ¶ 2.)

3

Nicholas anymore.  (Id. at 78:23-80:10.)  Mrs. Suida has no information that Nicholas and Rocky were ever together after that date.  (Id. at 85:22-86:10.)

After her conversation with the Suidas, Ms. Costa confirmed that Rocky and Nicholas were assigned to separate classrooms. While the classrooms were completely self-contained, they did, at times, share the playground.  Ms. Costa notified the teachers about the incident, and that Nicholas' parents were concerned about Nicholas being with Rocky.  However, she did not do a formal incident report as she believed, at the time, the circumstances did not indicate abuse.  She tried to contact Rocky's parents but was not able to do so.  (SUF ¶ 2.)  Ms. Costa later testified that Rocky's conversation with Nicholas was a "red flag" for possible sexual abuse.  (Ex. 2 [Costa Depo.] to Pls.' Appendix of Evid. ["PAE"], filed Nov. 21, 2005, at 110:25-111:19.)

Thereafter, on September 20, 2000, according to Dominick's mother, Christina Tranfaglia ("Mrs. Tranfaglia"), a teacher at CDC3 (Sandrea O'Conner, known as "Ms. Sam") told her about an incident between Rocky and Dominick (also age four).  (Ex. E ["Mrs. Tranfaglia's Depo."] to DAE at 43:22-44:8.)  Ms. Sam told Mrs. Tranfaglia that she found Rocky and Dominick under the loft at the school (which is located inside the classroom) with their pants down; Dominick was on his hands and knees with his buttocks facing Rocky who was on his knees with his pants pulled down. Dominick was crying and pulling away from Rocky saying "no, no, no."  Rocky was sent home.  (Id.)  The next morning, Dominick's parents, reported the incident to Ms. Costa, who asked Ms. Sam to

4

1   write a written report.  (SUF ¶ 3.)  Ms. Sam did so.  (Id.)

2       Mrs. Tranfaglia testified that Dominick told her Rocky had

3   asked Dominick to pull down his pants and that Rocky had asked

4   him to "kiss his (Rocky's) pee pee;" Dominick admitted he

5   complied with Rocky's request and kissed Rocky's "pee pee" and

6   Rocky kissed Dominick's "pee pee."  (Ex. 6 [Mrs. Tranfaglia's

7   Depo.] to PAE at 52:2-3, 56:3-8, 59:13-15.)  Dominick also told

8   Mrs. Tranfaglia that Rocky wanted to play a game called "kiss

9   butts."  (Id. at 44:12-16.)

10      After the incident involving Rocky and Dominick, Ms. Costa

11  reported the incident as well as the incident involving Nicholas

12  and Rocky to the Flight Chief and Family Advocacy Services (SUF ¶

13  3); due to those reports and to the complaints and concerns of

14  plaintiffs' parents, the Commander at Travis Air Force Base

15  called for a Command Directed Investigation ("CDI") of the

16  management of CDC3.  (Ex. F to DAE.)  An investigator was

17  appointed to inquire into the handling and reporting of child

18  abuse cases and the training qualification procedures for child

19  care providers at the CDCs on base.  Neither plaintiffs nor Rocky

20  were interviewed as part of this investigation because the

21  substantiation or non-substantiation of their allegations were

22  not part of the investigation.  (Id.)

23      Ultimately, the CDI concluded that all of the teachers at

24  CDC3 were properly trained and that the incidents were properly

25  reported.  (Id.)  While the report also concluded that the

26  students were properly supervised, it determined that the loft

27  inside the school and the train structure on the playground gave

28  the children a place to hide and prevented adult supervision.

The report recommended the train play-structure be removed and that the loft be removed or re-configured.  (Ex. 11 to PAE.)

Additionally, upon being notified by the Family Advocacy Office about a possible case of child abuse, the Air Force Office of Special Investigations ("OSI") conducted an investigation; as part of the investigation, various children were interviewed, including plaintiffs and Rocky, and their interviews were videotaped.  The interviews were conducted by Jim Mowry, a twelve-year OSI investigator who had received special training in the forensic interviewing of children.  According to defendant, the purpose of the investigation was not to determine precisely what occurred at the daycare, but rather to obtain leads to help determine if any children were being sexually abused by an adult, specifically an Air Force member.  The investigation concluded that Rocky learned the sexual behavior he was exhibiting from someone (a ten year old) who had no affiliation with the Air Force; the matter was referred to the Sacramento County Child Protective Services.  (Def.'s Mem. of P. & A. at 5:3-14.)[6]

///
///
///
///

---

[6]    Plaintiffs did not specifically object to this description of the purposes and nature of the OSI investigation. However, neither side offered into evidence any documentation of the investigation, other than the videotapes of plaintiffs' and Rocky's interviews.  The court has nonetheless provided these facts for background.

During Dominick's videotaped interview,[7] on September 26, 2000, Dominick first denies he knows Rocky, then later says he does, that he plays with him, and that Rocky is one years old. Dominick describes that Rocky showed Dominick Rocky's privates and Dominick "just walked away." Dominick says on one occasion in the loft, Rocky touched Dominick's penis by reaching into Dominick's clothes; Dominick did not touch Rocky's penis.

During Nicholas' videotaped interview, on October 10, 2000, Nicholas described an incident where he did not want to go in the playground train with Rocky because something bad would happen; he "didn't want to do it again." He described "it" as a game of "butts and pee pees;" and that he had played it with Rocky before ("we had did it at school"). With the use of drawings of bodies, Nicholas described how the game was played where Rocky put his penis in Nicholas' butt and mouth and Nicholas did the same to Rocky. He described that he played the game "5 or 6 or 4 times."

During Rocky's videotaped interviews on September 22 and October 27, 2000, Rocky described that Dominick touched Rocky's butt and "pee pee" (penis). Rocky described that Dominick put his "pee pee" in Rocky's butt and that Rocky put his "pee pee" in Dominick's butt; he said this took place at his house. Rocky

---

[7]    The court has reviewed the videotaped interviews of Dominick, Nicholas, and Rocky (a transcript of the tapes was not provided to the court by the parties). In the papers, both parties describe the children's testimony but in doing so they *characterize* the testimony in an effort to support their opposing positions. The videotapes, however, speak for themselves. (Lodged Videotapes, filed Nov. 21, 2005 [Docket #35].) Nonetheless, for purposes of this order, the following summary of the interviews is provided, based on the *court's* review of the videotapes; although, it is not intended to be a verbatim transcript but rather an *un*-characterized description of the key facts.

7

also describes that Dominick sucked Rocky's "pee pee" at his house and that Rocky sucked Dominick's "pee pee."  Rocky further describes playing "kiss butts" and "pee pee in the butts" in the loft at school with Dominick and Nicholas.  Rocky learned the "kiss butts" game from Chas, an older boy he knew and who he played the game with; he also played "pee pee in the butt" with Chas at Chas' house; he played "pee pee in the butt" with Chas by sucking Chas' penis and then Chas' sucking Rocky's penis.

Plaintiffs filed the instant lawsuit on November 24, 2003.  In the course of discovery, plaintiffs depositions were taken.  On April 28, 2005, Dominick, then 9, testified to the following:  He remembers going to daycare at CDC3; he does not remember the names of any children, except Rocky.  (SUF at ¶ 27.)  An incident happened in the playground train structure with Rocky; Rocky showed his penis to Dominick and Dominick then showed his penis to Rocky.  (Id. at ¶s 31, 33.)  Dominick did so because Rocky told him to do it.  Dominick grabbed the waistband of his shorts, quickly showed his penis and then pulled his shorts back up.  (Id. at ¶ 33.)  Rocky blocked Dominick's way out of the train until Dominick showed Rocky his penis; then Rocky let Dominick out.  (Id.)  Rocky did not touch or kiss Dominick's penis or buttocks and Dominick did not touch or kiss Rocky's penis or buttocks.  (Id. at ¶ 34.)  Dominick does not remember if a teacher caught him and Rocky during the incident.  (Id. at ¶ 36.)  Dominick does not remember anything ever happening with Rocky in the loft inside the school.  (Id.)  Dominick stated there were never any other incidents with Rocky.  (Id. at ¶ 38.)

///

On April 29, 2005, Nicholas, then 9, testified to the following: He does not remember going to daycare at CDC3.  (<u>Id.</u> at ¶ 8.)  He does not remember anything bad happening to him there.  (<u>Id.</u> at ¶ 9.)  Nicholas stated he has never heard of a game called "kiss butts" or "pee pee in the butts" and has never played it with anyone.  (<u>Id.</u> at ¶ 15.)  No one has ever pulled his pants down and showed Nicholas his penis; Nicholas has never lowered his pants and shown anyone his penis.  (<u>Id.</u> at ¶s 16-17.) No one, other than his mother, father, or a doctor has ever touched Nicholas' penis or buttocks; Nicholas has never touched any other child's penis or buttocks.  (<u>Id.</u> at ¶s 18-21.)

Finally, plaintiffs proffer evidence that over the years since the abuse, they have made statements regarding the abuse by Rocky to physicians and/or therapists.  (Exs. 4, 7, 9 to PAE.)

**ANALYSIS**

**I.**

**Motion to Re-Open Discovery**

Plaintiffs move to re-open discovery to take the deposition of Ms. Sam,[8] the teacher at CDC3 who found Rocky and Dominick under the loft with their pants down, on the grounds that:  (1) the original discovery deadline was only extended by the court at plaintiffs' request some 75 days; (2) as became apparent at the summary judgment hearing, Ms. Sam's testimony is critical to the liability issues in this case, namely whether the staff at CDC3 adequately supervised the children and whether the play structures at the facility prevented them from doing so; and

_____

[8]    Ms. Sam currently resides in Terra Haute, Indiana.

(3) "extenuating circumstances" provide "equitable grounds" for granting plaintiffs' motion in that plaintiffs' counsel is a sole practitioner who has had an extremely impacted schedule over the last six months.[9]

Pursuant to Rule 16, a pretrial scheduling order "shall not be modified except upon a showing of good cause." Fed. R. Civ. P. 16(b).  That "good cause" standard primarily focuses upon the diligence of the party requesting the amendment.  The district court may modify the pretrial schedule "if it cannot reasonably be met despite the diligence of the party seeking the extension." Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992).  "Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification.  If that party was not diligent, the inquiry should end." Id. at 610.

Plaintiffs' showing is insufficient to demonstrate good cause to re-open discovery for several reasons.  First, plaintiffs have had ample time to complete discovery in this case.  The case was filed November 23, 2003 and the pretrial scheduling order issued May 5, 2004; that order set the close of discovery for July 12, 2005.  However, at plaintiffs' request, defendant stipulated, and the court ordered, the continuation of the discovery cut-off twice, ultimately extending the date to

_____

[9]     Counsel's schedule included a two-week trial in another case; responses to four summary judgment motions; preparation for a major medical malpractice trial which was continued at the last minute in late October; and significant other discovery in this case.

September 26, 2005.  Second, plaintiffs ignore the fact that during the course of discovery in this case (which they maintain was "substantial"), their counsel took only one deposition, and during the extension of discovery for some eleven weeks, plaintiffs did not take any depositions.  Third, plaintiffs' counsel was specifically informed by defendant of Ms. Sam's whereabouts on May 9, 2005 and had adequate time to take her deposition before the original discovery cut-off on July 12 and certainly before the extended cut-off on September 26.  Fourth, plaintiffs have known of the need to depose Ms. Sam since the inception of this case; her written statement was part of the CDI investigation which plaintiffs have had since the beginning of this case.  Finally, in opposing defendant's motion for summary judgment, plaintiffs did not request to re-open discovery or make a motion under Rule 56(f); rather, they requested leave to file the instant motion only after the court's comments at oral argument emphasizing the relevance of Ms. Sam's testimony.

Therefore, for all of these reasons, the court DENIES plaintiffs' motion to re-open discovery.  If plaintiffs are to succeed in defeating defendant's motion for summary judgment, they must do so without the deposition testimony of Ms. Sam.

## II.

### Motion for Summary Judgment

#### A.   Evidentiary Issues

Defendant moves for summary judgment arguing that plaintiffs have no admissible evidence that they were sexually abused or molested at CDC3; defendant argues that any statements plaintiffs made regarding the alleged abuse by Rocky to their mothers, to

the OCI investigator, and/or to physicians or therapists are
inadmissible hearsay.  Defendant contends that the only
admissible evidence is plaintiffs' deposition testimony which
defendant argues demonstrates that "no actionable conduct
occurred;" rather, according to defendant, plaintiffs' deposition
testimony reveals nothing "more than normal inquisitive sex play
between 4-year-olds."  (Def.'s Mem. of P. & A. at 2:6.)

To the contrary, plaintiffs maintain that the "underlying"
evidence of abuse (*i.e.,* plaintiffs' statements to their parents,
the investigator and/or doctors) are admissible under the
residual exception to the hearsay rule (Federal Rule of Evidence
["FRE"] 807) and/or as recorded recollection (FRE 803(5)) and/or
as statements made for purposes of medical diagnosis (FRE
803(4)).

The court notes preliminarily that, at least with respect to
Dominick, reliance on evidence outside his deposition testimony
may not be necessary to defeat summary judgment.  Unlike
Nicholas, who recalled nothing about the alleged abuse at his
deposition, Dominick describes at least one incident of alleged
abuse which a reasonable trier of fact could determine is
"actionable."  At a minimum, Dominick describes a situation were
he was forced by Rocky to show Rocky his penis in order to be let
out of the train play-structure.  Contrary to defendant's
characterization of the event, a reasonable trier of fact could
well find this incident more than mere "inquisitive sex-play" as
the conduct was *coerced*.

Nevertheless, leaving this point aside, the court first
considers, generally, whether the videotaped interviews of

Nicholas, Dominick and Rocky[10] are admissible.  Because the court finds that the residual exception to the hearsay rule applies to the videotapes, it does not consider the applicability of FRE 803(5) (recorded recollection).

FRE 807 provides:  "A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if:" (1) the statement is offered as evidence of a material fact; (2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (3) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.  While courts have restricted application of this rule to extraordinary circumstances, courts have specifically employed the residual exception in child abuse litigation to admit hearsay statements of the victims.  United States v. Harrison, 296 F.3d 994, 1004 (10th Cir. 2002) (finding the consistency of the child abuse victim's prior statements to an FBI agent about the sexual abuse by the defendant sufficient to establish their "trustworthiness," even though the victim subsequently recanted her statements); Doe v. United States, 976 F.2d 1071, 1079 (7th Cir. 1992) (consistency and graphic descriptions by three year old child abuse victim to her mother strongly suggest her statements were trustworthy); United States v. Dunford, 148 F.3d 385, 392 (4th

---

[10]    While plaintiffs did not specifically request admission of Rocky's videotaped interviews, the court considers the issue as Rocky's interviews provide important corroboration of plaintiffs' statements.

13

Cir. 1998) (repetition and consistency of teenage abuse victims' statements about their father to government officials render the statements trustworthy).

Similarly here, sufficient guarantees of trustworthiness are present in that: (1) the children were questioned by Jim Mowry, a 12 year veteran OSI investigator who had received special training in forensic interviewing of child abuse victims; (2) the interviews were conducted according to an organized template which tested the children's ability to discern truth from lies; their cognitive ability; their ability to understand and express spatial relationships; and their recollection of their interactions with each other at CDC3;[11] (3) the statements were taken close in time to the alleged incidents (within days, if not at the longest, within approximately a month); (4) the children corroborated, at least in part, one another's stories, including descriptions of the same games, "kiss butts," "kiss pee pees," and "pee pee in the butt," coerced contact by Rocky, and touchings in similar ways[12]; (5) importantly, plaintiffs' statements were corroborated, at least in part, by the alleged *abuser*, Rocky; and (6) plaintiffs repeated their statements, at least in part, to parents and physicians/therapists.

///

---

[11]   Plaintiffs offer testimony from their expert, Dr. Grogan, as to the *reliability* of the process used. (Exs. 3, 10 to PAE.)

[12]   The court notes Dr. Grogan reviewed the tapes and concluded that the statements of the children bore remarkable similarities and were corroborative of each other (Ex. 10 to PAE.)

The court acknowledges, as defendant strenuously points out, that there are inconsistencies in the interviews (see Defs.' Reply, filed Dec. 5, 2005, at 6-9), however, the court must take into account the age of the children at the time, (four years old), and the gravity of the situation for these children. (See Ex. 10 [Dr. Grogan's Report] to PAE [describing the impact of this type of abuse on such young children]); United States v. Dorian, 803 F.2d 1439, 1444 (8th Cir. 1986) (inconsistency did not render a five year old sexual abuse victim's hearsay statements unreliable since "it frequently takes a long time for children to share what is really going on and they may then do so in stages, telling a little more each time.")  As the court remarked at oral argument, defendant's view of these videotapes is too mechanical, offering too little leeway for consideration of the children's age and the serious circumstances.  See Doe, 976 F.2d at 1079 ("it is to *overall* consistency that we look, not constancy with regard to each and every detail") (emphasis in original).

Finally, the court does not consider persuasive defendant's reliance on Mr. Mowry's interrogatory response that "based on the age of the children, it would be very hard for me to say any of the interviews were 'trustworthy' statements."  Defendant takes this statement out of context.  Mowry's response to interrogatories, construed as a deposition on written questions, was in reply to the question:  "Please set forth each and every step you took to obtain a trustworthy forensic statement from [Nicholas and Dominick] when you interviewed him on videotape in the course of the . . . [OSI investigation]."  Mowry's complete response was as follows:

15

[H]owever, there is an important aspect which I think
needs clarification.  The facts inserted in the Report
of Investigation (ROI) were facts AS presented by the
witnesses and victims in this case.  I cannot state
that any of my actions made their forensic videotape
statements "trustworthy."  I have opinions pertaining to
this case that were never contained in the ROI (we
don't report opinions, just facts).  I took all the steps
I could with all the VERY young children in this case,
but based on the age of the children, it would be very
hard for me to say any of the interviews were "trustworthy"
statements.

(Ex. 12 to PAE.)  Thus, Mowry's response is not contrary to the

court's findings.  He simply states his opinion that based on the

children's age it is not possible to say definitely that their

statements are trustworthy.  Similarly the court does not find

that the videotaped interviews are per se trustworthy, rather

that, based on the totality of circumstances, addressed above,

"sufficient" guarantees of trustworthiness are present.  <u>Doe</u>, 976

F.2d at 1080-81.

As to the remaining elements of FRE 807, they are easily met

(indeed, defendant did not argue said elements could not be met;

rather its argument focused only on the initial inquiry of

"trustworthiness"):  The videotapes interviews address a material

fact--the alleged abuse.  The videotapes are arguably *the most*

probative evidence on the issue of abuse since the statements

were made close in time to the alleged events, rather than five

years later at the time of Nicholas' and Dominick's depositions.

Also, considering the children's age, only four years old, the

statements likely have *more* indicia of trustworthiness then than

they do now (5 years after the events).  Likewise, the court

considers significant that plaintiffs did not simply repeat in

their depositions what their parents could have easily "coached"

16

them to testify (see Doe, 976 F.2d at 1079 ["'Consistency does not always guarantee trustworthiness; it could be evidence that the statements were rehearsed.'"]); in failing to recall the abuse, the children arguably appear more credible.  Lastly, the interests of justice are served in introducing the evidence, namely the protection of minors who suffered child abuse.

For largely the same reasons, Nicholas' and Dominick's statements to their parents would also be admissible under FRE 807.  Doe, 976 F.2d at 1080-81 (admitting three year old child's statements to mother under FRE 807).  Specifically as to the trustworthiness of the statements, they were made on the alleged day of the incidents, they were highly descriptive and detailed, plaintiffs acknowledge *their* involvement and compliance with Rocky's demands, and the statements were unsolicited.

Finally, regarding plaintiffs' (and their parents') statements to physicians and/or therapists, plaintiffs argue the statements are admissible under FRE 803(4) which provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . . (4). . . Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Courts have consistently admitted under FRE 803(4) statements made by child abuse victims and their parents to physicans/therapists in the course of treatment of the child.  See United States v. Renville, 779 F.2d 430, 436-38 (8th Cir. 1985) (statements made by child abuse victim to her treating physician identifying defendant as the abuser were admissible);

17

Morgan v. Foretich, 846 F.2d 941, 948-49(4th Cir. 1988) (child abuse victim's statements about the abuse to her physician should have been admitted despite victim's competency to testify at trial) ; United States v. Provost, 875 F.2d 172, 176-77 (8th Cir. 1989) (minor sexual assault victim's statements to psychologists and physicians regarding identity of assailant admissible under FRE 803(4)).  Plaintiffs proffer evidence that both Dominick and Nicholas sought and received psychiatric treatment as a result of the incidents.  (Exs. 4, 7, 9 to PAE.)  As part of that treatment, plaintiffs and their parents made statements to doctors and therapists about the abuse by Rocky.  Said evidence is admissible under the above cited authorities.

### B.  Standard

The Federal Rules of Civil Procedure provide for summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c); see California v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998).  The evidence must be viewed in the light most favorable to the nonmoving party. See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."  Nissan Fire & Marine

18

Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000). However, if the nonmoving party has the burden of proof at trial, the moving party only needs to show "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325.

Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. See Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint.  See Nissan Fire & Marine, 210 F.3d at 1107.  Instead, through admissible evidence the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

### C.   Claims for Relief[13]

It must be noted initially that defendant does not move for summary judgment specifically as to each pending cause of action

---

[13]   Pending against defendant are the following claims as set forth in plaintiffs' first amended complaint, filed January 30, 2004: (1) First Cause of Action – Negligent Daycare Operation (2) Second Cause of Action – Negligent Childcare; (3) Third Cause of Action – Negligent Hiring; (4) Fourth Cause of Action – Negligent Supervision; (5) Fifth Cause of Action – Abuse of a Minor; (6) Sixth Cause of Action – Intentional Infliction of Emotional Distress; (7) Eighth Cause of Action – Premises Liability; and (8) Ninth Cause of Action – Breach of Fiduciary Duty.  Per the court's order of January 7, 2005 (Docket #18), plaintiffs' claims against defendant for the following were dismissed:(1) Seventh Cause of Action – Battery; (2) Tenth Cause of Action – Intentional Misrepresentation; (3) Eleventh Cause of Action – Negligent Misrepresentation; (4) Twelfth Cause of Action – Breach of Contract; and (5) Thirteenth Cause of Action – Negligence Per Se.

1    against it, described above (fn. 13); instead, defendant argues,

2    generally, in the motion that plaintiffs cannot sustain a

3    "negligence claim" against defendant because (1) "nothing

4    consequential happened at [the] daycare" by plaintiffs' own

5    admissions in their deposition testimony and (2) "even if

6    something [actionable] occurred at CDC3, there are no facts to

7    establish [negligence]." (Mem. of P. & A. at 14, 16.) Thus, for

8    purposes of resolving the motion only two inquires are relevant:

9    (1) whether a triable issue of fact exists as to instances of

10   "child abuse" and (2) if so, whether a triable issue of fact

11   exists as to defendant's "negligence."

12        Regarding the first inquiry, the court's evidentiary rulings

13   above are dispositive of the issue.  Considering plaintiffs'

14   statements to their parents, to the OCI investigator, and to

15   physicians/therapists, there is ample evidence to raise a triable

16   issue of fact that instances of child abuse occurred at CDC3.

17   Specifically regarding Nicholas, while defendant is correct that

18   his deposition testimony does not provide a factual basis for his

19   claim, his prior statements to his parents, his videotaped

20   interview, and his statements to his physicians and therapists

21   supply evidence of the abuse.  As to Dominick, his deposition

22   testimony alone raises a triable issue as to abuse; contrary to

23   defendant's characterization that the described incident was

24   simply "one brief incident [between] two 4-year-olds involving a

25   [game] of 'you show me yours and I'll show you mine,'" Dominick

26   is clear that his actions, in pulling down his pants to show

27   Rocky his penis, were not voluntary but *coerced* by Rocky who

28   would not let him leave the train play-structure without

20

complying with Rocky's demand.  Additionally, considering the
other evidence which the court finds admissible, including
Dominick's statements to his mother, the OCI investigator, and
his doctors and therapists further support a finding of a triable
issue of fact as to abuse.

As to the next inquiry, defendant argues that even
considering all the alleged evidence of abuse (including what it
deems the "inadmissible hearsay evidence"), plaintiffs have no
evidence of defendant's negligence.  At most, defendant argues
the evidence establishes only two events of which the CDC3 was
aware: (1) the conversation between Rocky and Dominick wherein
Rocky asked Nicholas to play a game of "pee pee in the butt" and
if he did not play, Rocky would punch Nicholas in the face and
(2) the incident in the loft between Rocky and Dominick where
they were found by Ms. Sam with their pants down (Dominick
described to his mother that Rocky had asked him in the loft to
pull down his pants and "kiss Rocky's pee pee" which Dominick did
and Rocky kissed Dominick's penis).[14]  As to both instances,

_____

[14]   The government strongly objects, on the basis of
inadmissible hearsay, to any reliance on the written report of
"Ms. Sam."  Ms. Sam's report, written at the direction of Ms.
Costa, was not provided to the court as evidence on the motion
for summary judgment.  Instead, evidence of her observations came
in through the deposition testimony of Dominick's mother and Ms.
Costa, who was also told of the incident between Dominick and
Rocky by Ms. Sam.  In one sense, said evidence is not hearsay as
it is not being offered for the truth of the matter asserted but
rather as evidence of "notice" and/or a lack of supervision of
the children by the CDC3; although, plaintiffs do also seek to
rely on Ms. Sam's observations as evidence of the abuse itself.
In that regard, the evidence is inadmissible hearsay.  However,
admission of the evidence is not necessary for plaintiffs to
defeat summary judgment.  Importantly, Dominick also told his
mother about the incident in the loft (which Ms. Sam apparently
observed at least in part).  That evidence comes in, for the
reasons stated above, under FRE 807.

defendant argues it acted appropriately in response to the
complaints.

Under the FTCA, liability is determined applying the
substantive tort law of the state where the incident occurred,
which in this case is California.  28 U.S.C. §§ 2671-2680.
California Civil Code § 1714(a) sets out a basic standard of
conduct: "Everyone is responsible . . . for an injury occasioned
to another by his want of ordinary care or skill in the
management of his property or person."  For liability to exist,
there must be a legal duty owed which was breached.  Nally v.
Grace Community Church, 47 Cal.3d 278, 292 (1988).  Here, the
parties do not dispute that under California law, child
development centers are deemed as having a special relationship
with the children under their care, and that that special
relationship imposes a duty upon the adult care givers to protect
the children under their care from harm resulting from third
party misconduct that is reasonably foreseeable.  See Gavin W. v.
YMCA of Metropolitan Los Angeles, 106 Cal. App. 4th 662, 665
(2003).  Specifically, a daycare center can be liable if a
plaintiff establishes that the center's employees negligently
failed in their duty to protect and safeguard the children while
they were under the center's care and control.  Doe v. United
States, 838 F.2d 220, 224 (7th Cir. 1988).  As in Doe, central to
this case is whether CDC3 employees properly supervised the
children.

Defendant argues first that plaintiffs have no evidence CDC3
was aware of any problems with Rocky prior to being informed of
the above two incidents between plaintiffs and Rocky.  Once

informed of them, defendant contends CDC3 acted appropriately.

As support, defendant points to the evidence that:  After her

conversation with Nicholas' parents, Ms. Costa confirmed that

Rocky and Nicholas were assigned to separate classrooms; she

talked with staff about the incident and notified them about

Nicholas' parents' concern about Rocky and Nicholas being

together; and she attempted to contact Rocky's parents.  After

the report regarding Dominick and Rocky, Ms. Costa asked Ms. Sam

to provide a written statement; she immediately contacted the

Flight Chief and Family Advocacy Services; she then spoke with

Rocky's mother and Rocky was not allowed to stay at daycare that

day.  Defendant thereafter fully investigated the facility and

plaintiffs' complaints through the CDI and OCI investigations.

In further support of this fact, defendant offers the declaration

of its expert, Toni Koppen, the Chief of Family Member Programs

for the Air Force, who concluded that all Air Force policies and

procedures were followed in this case (Ex. G to DAE at 4-5.)

     Plaintiffs argue, to the contrary, that by application of

the doctrine of *res ipsa loquiter*, defendant's negligence may be

presumed.  In California, the doctrine is defined by statute as

"a presumption affecting the burden of producing evidence."  Cal.

Evid. Code § 646(b).[15]  The presumption arises when the evidence

_____

[15]    Section 646 provides in full: "(a) As used in this
section, "defendant" includes any party against whom the res ipsa
loquitur presumption operates.  (b) The judicial doctrine of res
ipsa loquitur is a presumption affecting the burden of producing
evidence.  (c) If the evidence, or facts otherwise established,
would support a res ipsa loquitur presumption and the defendant
has introduced evidence which would support a finding that he was
not negligent or that any negligence on his part was not a
proximate cause of the occurrence, the court may, and upon
request shall, instruct the jury to the effect that: (1) If the

establishes three conditions: (1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; and (3) it must not have been due to the voluntary action or contribution on the part of the plaintiff.  See Brown v. Poway Unified Sch. Dist., 4 Cal. 4th 820, 825-26 (1993).  A presumption affecting the burden of proof requires the trier of fact to assume the existence of the presumed fact unless the defendant produces evidence to the contrary.  Id.  "If the defendant introduces 'evidence which would support a finding that he was not negligent or that any negligence on his part was not a proximate cause of the occurrence,' the trier of fact determines whether defendant was negligent without regard to the presumption, simply by weighing the evidence."  Id. at 826.

Here, absent applicability of this doctrine, plaintiffs cannot withstand summary judgment, at least with regard to Nicholas, as they have not proffered any evidence that CDC3 knew of any wrongdoing by or problems with Rocky, prior to Nicholas' parents' complaint on September 18, 2000.  Considering the evidence, however, as revealed by Nicholas in his videotaped OCI

facts which would give rise to res ipsa loquitur presumption are found or otherwise established, the jury may draw the inference from such facts that a proximate cause of the occurrence was some negligent conduct on the part of the defendant; and (2) The jury shall not find that a proximate cause of the occurrence was some negligent conduct on the part of the defendant unless the jury believes, after weighing all the evidence in the case and drawing such inferences therefrom as the jury believes are warranted, that it is more probable than not that the occurrence was caused by some negligent conduct on the part of the defendant."

1  interview, plaintiffs have raised a triable issue of fact

2  sufficient to find that plaintiffs may be entitled to the *res*

3  *ipsa loquiter* presumption.

4      Neither party offers any controlling case law, nor is the

5  court aware of any, either invoking or disallowing the *res ipsa*

6  *loquiter* presumption in a case involving similar facts.  From the

7  court's research, the most analogous California cases arise in

8  the child dependency context, involving invocation of California

9  Welfare and Institutions Code § 355.1, which has been compared to

10  the doctrine of *res ipsa loquiter.*  <u>See</u> <u>In re E.H.</u>, 108 Cal. App.

11  4th 659, 669-70 (2003).  Section 355.1 also creates a presumption

12  affecting the burden of proof.  It provides:

> (a) Where the court finds, based upon competent
> professional evidence, that an injury, injuries, or
> detrimental condition sustained by a minor *is of a*
> *nature as would ordinarily not be sustained except*
> *as the result of the unreasonable or neglectful acts*
> *or omissions of either parent, the guardian, or*
> *other person who has the care or custody of the minor*,
> that finding shall be prima facie evidence that the minor
> is a person described by subdivision (a) [child at serious
> risk of physical harm inflicted non-accidently],
> (b) [child at serious risk of physical harm for failure
> to supervise], or (d) [child at risk of sexual abuse]
> of Section 300 . . .
> (c)  The presumption created by subdivision (a)
> constitutes a presumption affecting the burden of
> producing evidence.

22  Cal. Wel. & Inst. Code § 355.1 (emphasis added).  The court finds

23  that this statute, although not directly relevant here, is

24  particularly instructive on the issue of application of *res ipsa*

25  *loquiter* in this child abuse case.  While the court is cognizant

26  to "avoid applying the res ipsa loquiter doctrine in a way that

27  undermines our system of tort liability based on fault,"

28  plaintiffs have done more here than simply "prove that [Nicholas]

25

1   was injured by some unidentified person's negligence." <u>Lamb v.</u>
2   <u>State of Tenn.</u>, 2002 Tenn. App. Lexis 738, *22-23 (Oct. 16,
3   2002).

4        In <u>Lamb</u>, the plaintiff mother brought suit alleging her
5   mentally impaired daughter was sexually abused while in the
6   custody of the Alvin C. York Agricultural Institute.  Plaintiff
7   attempted to invoke the doctrine of *res ipsa loquiter* to
8   establish the defendant's negligence; however, the court found
9   her showing inadequate in that she failed to establish her
10  daughter was, in fact, injured while in the care of the defendant
11  and that her daughter's injuries were "probably caused" by the
12  defendant's negligence.  <u>Id.</u> at *25.  However, in so ruling, the
13  court discussed at length the doctrine of *res ipsa loquiter*, and
14  important to this case, the court *did not* find the doctrine
15  inapplicable, theoretically, to this type of case.  Indeed, the
16  court found that the doctrine *would be* applicable where a
17  plaintiff brings "home [the negligence] to [the] defendant" and
18  shows "a rational basis for concluding that the negligent conduct
19  that caused the injury is probably attributable to the
20  defendant." <u>Id.</u> at *22-23 (*citing* W. Page Keeton, <u>Prosser and</u>
21  <u>Keeton on the Law of Torts</u> § 39 at 248 (5th ed. 1984)).  The court
22  finds that this is such a case.

23       Here, the nature of the incidents between Nicholas and
24  Rocky, involving repetitive and elaborate conduct over a short
25  period of time, are of the kind that do not occur in the absence
26  of a daycare provider's failure to properly supervise the
27  children.  The court emphasizes that if Nicholas' statements in
28  the interview are believed, the serious conduct at issue occurred

26

some 4 to 6 six times over only an approximately two month
period;[16] the conduct involved not mere touchings but rather
forced penetration by Rocky of his penis into Nicholas' buttocks.
It is undisputed that both Nicholas and Rocky were under the
exclusive care and custody of CDC3, and, again, if Nicholas is
believed, his participation in the conduct was not voluntary or
contributory (Nicholas described that he did not want to play
"butts and pee pees" again; that it was something "bad.")  On
these facts, as described by Nicholas close in time to the
events, plaintiffs may be entitled to application of the doctrine
and the presumption.

As to Dominick, it is not necessary to turn to the doctrine
of *res ipsa loquiter* because plaintiffs have proffered sufficient
evidence to raise a triable issue of fact that defendant acted
negligently in responding to Nicholas' report and that negligence
caused the harm to Dominick days later.  Specifically, plaintiffs
proffer evidence that: Ms. Costa did not make a formal complaint
as to the incident between Rocky and Nicholas because she did
not, at the time, consider it abuse; she did not ensure that
thereafter Rocky was more closely monitored; she did not talk
with Rocky's parents about the incident; yet, she later testified
at her deposition that the incident between Rocky and Nicholas
was a "red flag" for abuse.  Just days after the incident between

---

[16]     Neither party proffered evidence establishing the dates
when plaintiffs and Rocky attended CDC3.  However, at oral
argument, plaintiffs' counsel represented that Nicholas and Rocky
were together at the facility for approximately two months, and
Dominick and Rocky were together at the facility for
approximately one month.  Defendant's counsel did not object to
this representation to the court.

Nicholas and Rocky, a much more serious incident occurred between Rocky and Dominick.  Considering this evidence, a reasonable trier of fact could find that proper supervision of Rocky could have prevented the abuse of Dominick on September 20, 2000.[17]

Thus, the court cannot find with respect to Dominick that as a matter of law defendant was not negligent.  Rather, a reasonable trier of fact, viewing the facts in the light most favorable to plaintiffs, could find that CDC3 should have done much more after the report of the incident between Rocky and Nicholas.  Indeed, if plaintiffs' evidence is believed, all that was done was to ensure the two children were in separate classrooms; they continued, however, to share time on the playground.  Arguably, additional monitoring of Rocky was warranted in light of his violent threat to punch Nicholas if he did not play a very descriptive "game" of "pee pee in the butt."  A conversation with Rocky's parents never took place, and just days later, (as told by Dominick to his mother) Rocky forced Dominick to kiss Rocky's penis and Dominick kissed Rocky's penis.  With respect to Dominick's claim, said evidence establishes a triable issue of fact as to CDC3's negligence.

///

---

[17]     Plaintiffs additionally rely on the CDI report to argue that defendant negligently maintained its facilities in that the loft and train play-structure prevented the visual observation of the children at all times.  The court does not rely on said report in ruling on the motion as neither plaintiffs nor defendant (who cites the report as evidence of CDC3's proper investigation of the incidents) established its admissibility. While the report may well qualify under the business records exception to the hearsay rule and/or as an admission of a party opponent that showing was not made by the parties on the motion. Nevertheless, the report is not necessary for plaintiffs to withstand summary judgment.

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion to re-open discovery is DENIED.  Defendant's motion for summary judgment is DENIED.

IT IS SO ORDERED.

DATED: February 10, 2006


                                        /s/ Frank C. Damrell Jr.
                                        FRANK C. DAMRELL, Jr.
                                        UNITED STATES DISTRICT JUDGE